# EXHIBIT 1

E-FILED 2024 MAY 21 12:44 PM SCOTT - CLERK OF DISTRICT COURT

IN THE IOWA DISTRICT COURT FOR SCOTT COUNTY

| | |
|---|---|
| JENNIFER LINN GOTT, | CASE NO. _____ |
| Plaintiff, | |
| vs. | |
| UNITED PARCEL SERVICE, Inc., and MIKE ALLISON, ANDREW WOOD, BRIAN BELL, JOHN SCHAAF, NEIL McKINNEY, and JULIE JENNINGS, Individually, | **PETITION AT LAW AND JURY DEMAND** |
| Defendants. | |

COMES NOW the Plaintiff, Jennifer Linn Gott (hereinafter "Plaintiff" or "Gott"), in support of her Petition at Law and Jury Demand against Defendants United Parcel Service, Inc. and Mike Allison, Andrew Wood, Brian Bell, John Schaaf, Neil McKinney, and Julie Jennings, individually, and states as follows:

## INTRODUCTION

1.    This is an action by the Plaintiff, Jennifer Linn Gott, against the Defendants alleging that Plaintiff was defamed, that Defendants tortiously interfered with her employment rights, intentionally caused her emotional distress, abused process to harass and intimidate her, and in fact that there was a concerted agreement to do so, and that Plaintiff was discriminated against and harassed because of her age, sex, and disabilities in violation of the Iowa Civil Rights Act, Iowa Code Chapter 216. Plaintiff also alleges she was retaliated against in violation of Iowa Code Chapter 216.

## PARTIES

2.    Plaintiff was at all material times hereto a resident of Davenport, Scott County, Iowa, and an employee of Defendant United Parcel Service, Inc.

E-FILED 2024 MAY 21 12:44 PM SCOTT - CLERK OF DISTRICT COURT

3.    Defendant United Parcel Service, Inc. ("UPS") is incorporated in Ohio with its home office in Georgia.

4.    Defendant UPS owns and operates a center in Davenport, Iowa.

5.    Defendant Mike Allison was at all times material hereto a UPS Center Manager working in Davenport, Iowa and is a resident of Le Claire, Scott County, Iowa.

6.    Defendant Andrew Wood, was at all material times hereto employed as a security employee for UPS and upon information and belief, is a resident of Waukesha County, Wisconsin.

7.    As it relates to this lawsuit, Defendant Brian Bell was a UPS Full-Time Pre-Load Manager working in Davenport, Iowa and is a resident of Blue Grass, Scott County, Iowa.

8.    Defendant John Schaaf was at all times material hereto a UPS Security Supervisor working in Davenport, Iowa and is a resident of Moline, Rock Island County, Illinois.

9.    Defendant Neil McKinney was at all times material hereto Vice President of the Teamsters Local 710 union which currently serves, among others, Davenport UPS employees, and he is a resident of Evansville, Vanderburgh County, Indiana.

10.    Defendant Julie Jennings was at all times material hereto an employee of UPS and a resident of Blue Grass, Scott County, Iowa.

## JURISDICTION AND VENUE

11.    This Court has jurisdiction over this matter as the value exceeds the small claims jurisdictional amount.

12.    Venue is appropriate in this court as the Defendants are doing business in Scott County, Iowa and the acts complained of occurred within Scott County, Iowa.

## PROCEDURAL PREREQUISITES

13.     Plaintiff timely filed her administrative complaint with the Iowa Civil Rights Commission and was issued a right to sue letter.

## FACTS

14.     Plaintiff began working for UPS more than 28 years ago and she still works for UPS as a small sort employee working at the Davenport, Iowa UPS Center located at 1224 West 76th Street, Davenport, Iowa 52806.

15.     During the time that Plaintiff has worked for UPS she has received regular pay raises and positive job performance feedback.

16.     Plaintiff has worked as a union steward for approximately four years and is still currently a union steward.

17.     Plaintiff had a generally positive job experience working for UPS until approximately November of 2022.

18.     On or about November 9, 2022, Plaintiff was engaged in union activities and discussing worker rights with members when Defendant McKinney stormed out of a panel room and pulled Plaintiff into a breezeway where he cornered her and began loudly yelling and cussing at her belligerently for educating union members as to their rights.

19.     The interaction between McKinney and Plaintiff was unlike any other she had witnessed at UPS or within the union and Plaintiff felt very threatened by McKinney.

20.     This interaction with McKinney is when Plaintiff's employment circumstances began to take a turn for the worse.

3

E-FILED 2024 MAY 21 12:44 PM SCOTT - CLERK OF DISTRICT COURT

21.   At approximately the end of November or early December, 2022, Center Manager, Defendant Allison, told Plaintiff she needed to go to a conference room at the Davenport UPS Center after she was done working.

22.   Plaintiff went to the conference room as instructed where a union steward was already present.

23.   Plaintiff asked the union steward if he knew what was going on and he said he did not know.

24.   Security employee Defendant Wood then entered the room.

25.   Wood sat down and said "I'm here to talk to you about a phone that was destroyed, are you aware of that?"

26.   Plaintiff said she was aware of the issue involving another employee, Julie Jennings', phone.

27.   Wood said "I bet you are" and proceeded to interrogate Plaintiff regarding Jennings' phone while all the time accusing her of destroying it.

28.   Wood said UPS had video of the incident.

29.   Plaintiff denied destroying the phone.

30.   Wood continued to interrogate Plaintiff and continued to mention that he had a video recording of the incident.

31.   Plaintiff asked to see the video.

32.   Wood did not show any video to Plaintiff but did eventually admit to Plaintiff that the video did not show Plaintiff dumping water on the phone.

33.   Jennings had alleged to UPS management that Gott dumped a bottle of water into Jennings' bag, soaking her phone and causing damage to the phone.

E-FILED 2024 MAY 21 12:44 PM SCOTT - CLERK OF DISTRICT COURT

34. Wood said he had 10 days to investigate and Plaintiff asked if he needed anything else from her and he said he did not.

35. Plaintiff had been scheduled to stay for the second sort that day but was shocked and upset by the surprise interrogation and Wood's relentless questioning that implied she was guilty. Plaintiff asked Allison if she could leave for the day and Allison said she could.

36. A day or two after this interrogation, Jennings stood near Plaintiff at work staring at her. Plaintiff asked Jennings if she needed to pass by her and Jennings said "what did I ever do to you?"

37. Plaintiff found out later that day that Jennings had gone to many of Plaintiff's coworkers around the same time and had told them not to trust Plaintiff and told them that Plaintiff had ruined Jennings' phone, and that Jennings was going to take Plaintiff to court.

38. UPS performed an investigation regarding Jennings' allegations.

39. After review by UPS' labor relations manager and UPS' Center Manager in Davenport (Defendant Allison), UPS did not discipline Plaintiff in any way regarding the phone allegations.

40. In approximately the middle of December, 2022, Plaintiff received a letter and police report from Jennings by certified mail. The letter threatened that if Plaintiff did not pay for damage to Jennings' cell phone and the cost of the certified mail, that Jennings would file a petition in small claims court and that Jennings would seek damages and court fees from Plaintiff.

41. Plaintiff found Jennings' actions and demeanor unpredictable and did not feel safe around her.

5

42.     On December 17, 2022, Plaintiff went to Allison and gave him the police report and letter she had received from Jennings. Plaintiff told Allison that as a result of what she had received from Jennings she made her own police report. Plaintiff also told Allison that Plaintiff was scared for her safety and the safety of other employees mentioned in Jennings' police report. Allison said he would forward the matter to security because it was not his concern and security handled these things. Plaintiff told Allison she wanted someone other than Wood handling the situation and that she feared for her job given her prior interaction with Wood.

43.     Allison told Plaintiff her complaint to him would not put her job in jeopardy.

44.     On January 23, 2023, Plaintiff spoke with Allison regarding ongoing issues with Jennings, how she would stare Plaintiff down at break, and that she had told yet another employee not to trust Plaintiff.

45.     Allison told Plaintiff it had been discussed with both parties and he would follow up.

46.     During this conversation, Allison said that court and outside issues are not addressable inside the company. He also said Defendant Bell, as one of Plaintiff's supervisors, had been made aware of the situation.

47.     Plaintiff shared with Allison that she was avoiding certain areas within the building to avoid any contact with Jennings. Plaintiff raised with Allison the "not in my house" UPS harassment policy. Allison said all parties involved would be read the policy and Jennings' direct manager would be involved.

48.     Allison assured Plaintiff that if she continued to conduct herself as she had done in the past then there was no reason to fear for her job, that she had not been "convicted" or

E-FILED  2024 MAY 21 12:44 PM SCOTT - CLERK OF DISTRICT COURT

witnessed doing anything wrong, and that she was doing everything she was supposed to be doing in this situation.

49.     On June 5, 2023, Plaintiff was served papers for small claims court in an action filed by Jennings.

50.     Jennings was the plaintiff in the action and she had had filed a small claims action against Plaintiff in this action (Jennifer Gott) over damage to Jennings' cell phone, claiming that Plaintiff was responsible for the damage to Jennings' phone.

51.     On July 7, 2023, while Plaintiff was working the customer counter, a private process server came in to serve subpoenas to employees on behalf of Jennings and for Jennings' small claims action. Plaintiff told the server that UPS did not typically allow service on employees while at work, but that she would get a supervisor to speak to him.

52.     Allison was on vacation so Plaintiff informed another supervisor and continued to help customers at the counter.

53.     The supervisor that Plaintiff informed told the process server he could stay in the building but that he needed to stay near the employee guard shack and that they were not going to pull employees off the job to be served.

54.     The server was combative but eventually went near the guard shack.

55.     On July 10, 2023, after Allison returned from vacation, Plaintiff was not at work when she received a phone call and learned from the caller that Allison was helping Jennings serve subpoenas for Jennings' small claims action against Plaintiff. Other UPS employees were being paid by Jennings to serve subpoenas too and were also serving subpoenas. Allison and the other UPS employees assisting Jennings with serving the subpoenas were all on the clock and working for UPS at the time.

7

E-FILED  2024 MAY 21 12:44 PM SCOTT - CLERK OF DISTRICT COURT

56.     Plaintiff called UPS Human Resources based in Des Moines.  Plaintiff told HR that she was being harassed and that it was outrageous and she could not believe what was happening.  HR told Plaintiff to call the 1-800 number UPS had for employee complaints or that Plaintiff needed to get in touch with UPS security.  Des Moines HR told Plaintiff there was nothing they could do.

57.     Plaintiff made an appointment with Defendant Schaaf in Davenport UPS security to meet with him on July 12, 2023.

58.     When Plaintiff met with Defendant Schaaf, she told him she feared for her safety and she told Schaaf everything that had happened so far and that she felt she was being singled out, that it was a witch hunt, and that she had been told by Allison that UPS management could not help with civil matters, and yet he was now assisting Jennings with serving civil subpoenas in a case against Plaintiff.  Schaaf took notes the whole time.

59.     Schaaf told Plaintiff she needed to read the harassment policy and the confidentiality policy.  He read Plaintiff the policies and told Plaintiff that if she spoke up about the Jennings situation she could be in a lot of trouble up to and including termination.

60.     Schaaf's warning to Plaintiff about confidentiality made no sense.  At the time, most employees within the Davenport UPS center already knew about what was occurring with Jennings and Jennings' complaints against Plaintiff and none of them had learned the information from Plaintiff.

61.     Schaaf asked Plaintiff to sign the policies and she refused to sign them because instead of listening to Plaintiff and helping her, Schaaf was attempting to turn Plaintiff's complaints of harassment and a hostile work environment against her.

8

62.     Later that same day, on July 12, 2023, Plaintiff received a text message from Defendant Bell informing her she would need to report to the preload shift the next morning. At the time, Plaintiff had been filling in for another employee and had been working the customer counter. Plaintiff called Bell who told Plaintiff that Allison had told him to send Plaintiff the text telling her to work preload. Bell also told Plaintiff that she was now expected to work both shifts—the morning preload shift, for which the hours vary, but are approximately 4:45a.m.-9a.m., and the customer counter shift, for which the hours vary but Plaintiff typically worked either 7:30a.m.-noon or 3:45p.m.-8p.m.

63.     Bell's instructions to Plaintiff to work her regular shift and another shift in the same day was a course of action that had been challenged in the past and had stopped at the UPS Davenport center. Plaintiff believed that she was being retaliated against for complaining.

64.     Plaintiff complained to Allison who informed her she would need to report to both shifts.

65,     Plaintiff then complained to the District Manager of the Davenport center, and the District Manager told Plaintiff she needed to work as directed.

66.     Plaintiff reported to work the next morning as directed. Bell, upon seeing Plaintiff that morning, remarked "Oh, I'm surprised you're here."

67.     Plaintiff had begun therapy by this point due to the stress she was experiencing related to Jennings' accusations against her and UPS management's involvement and participation in helping Jennings perpetuate her accusations against Plaintiff.

68.     Plaintiff's therapist diagnosed her as having workplace PTSD.

69.     The events of July 12 and July 13, 2023, where Plaintiff's complaints had been turned against her and then she was retaliated against for complaining compounded everything

9

E-FILED 2024 MAY 21 12:44 PM SCOTT - CLERK OF DISTRICT COURT

Plaintiff had been experiencing. On July 14, 2023, and based on the advice of her therapist, Plaintiff did not go in to work. She called in to work on July 14, 2023 and then followed up with paperwork for short term disability.

70.     Plaintiff was thereafter approved for use of short-term disability benefits.

71.     On or about July 19, 2023, Plaintiff filed an internal complaint at UPS called an ethicspoint complaint. Plaintiff described within this complaint the situation with Jennings, including that UPS management was involved in supporting Jennings' complaint against Plaintiff, and that she was experiencing a hostile work environment that included at least weekly harassment from Jennings.

72.     While the ethicspoint complaint was pending, Plaintiff updated it a few times, including when Plaintiff learned that Jennings was telling people at work about Plaintiff's PTSD and making fun of it.

73.     Plaintiff does not know how Jennings learned of her PTSD—it was confidential, mental health information.

74.     Plaintiff wrote within her updated ethicspoint complaint that the situation was causing her tremendous stress.

75.     On August 11, 2023, Plaintiff learned that the local sheriff's office had stopped in to UPS to deliver updated subpoenas to the employees Jennings had subpoenaed for the small claims hearing in Jennings' action against Plaintiff. For all of the years that Plaintiff had worked at UPS, the sheriff's office had never been permitted to serve subpoenas on site but had been instructed by UPS Human Resources to find the employees they needed to serve during non-work time and while offsite.

E-FILED 2024 MAY 21 12:44 PM SCOTT - CLERK OF DISTRICT COURT

76.     On August 11, 2023, however, the sheriff's office employee was invited in to a conference room at UPS and was permitted to serve UPS employees while they were on the clock.

77.     UPS management performed a brief investigation of Plaintiff's ethicspoint complaint including an interview with Plaintiff.

78.     Schaaf called Plaintiff on August 16, 2023 to let her know the investigation was complete.

79.     Plaintiff asked what was going to make her feel safe when she returned to work given all that had happened.

80.     Schaaf, again attempting to use Plaintiff's complaints against her, told Plaintiff this had all been about confidentiality so he could not share that with Plaintiff and only told her that she would see a "notable change in operations" when she returned.

81.     On August 18, 2023, two days after Plaintiff's investigation was closed, Plaintiff's son, Seth Jackson, who works for UPS as a driver, was terminated by UPS management based on a false allegation.

82.     Jackson's termination was direct retaliation against Plaintiff for filing the ethicspoint complaint and otherwise complaining to UPS management/security/human resources.

83.     Jackson challenged his termination and was allowed to return to work two days later.

84.     On August 31, 2023, the small claims matter went to hearing in the Iowa District Court for Scott County, Iowa, and Defendant Wood, who had first interrogated Plaintiff about Jennings' phone, and who was based out of Wisconsin, appeared in the small claims matter and testified against Plaintiff.

11

E-FILED 2024 MAY 21 12:44 PM SCOTT - CLERK OF DISTRICT COURT

85.     Allison also appeared at the small claims action as a potential witness for Jennings although he was not called to testify.

86.     Wood testified during the hearing that UPS legal knew he was attending the small claims action and was permitting him to appear and offer testimony.

87.     The Judge in the small claims matter ruled against Jennings, holding that Jennings failed to sustain her burden to prove by a preponderance of the evidence that Gott had anything to do with water ending up in Jennings' bag or any damage to the phone that resulted from water spilling in Jennings' bag.

88.     On September 26, 2023, on a national UPS employee Facebook page, and after the small claims court ruling against her, Jennings wrote: "What happens when a co worker/union steward intentionally damages your phone by dumping your water bottle into your bag with your phone at the bottom, out of spite because you are allowed to work overtime . . . nothing. They have her on video, but too grainy for court. UPS also had still shots and clear video but . . . oops it time lapsed . . . so sorry . . ."

89.     Comments in response to this false Facebook post were filled with hateful responses which encouraged such things as popping the tires of the "co worker/union steward" or pouring sugar in her gas tank, among other things.

90.     Although Plaintiff's name had not been used in the post, everyone working within the Davenport building, and others too, were aware of Jennings' complaint against Plaintiff and could easily identify Plaintiff as the subject of her complaint.

91.     On October 2, 2023, Plaintiff filed another ethicspoint complaint regarding both the Facebook postings, which were contrary to UPS policy, and as to her son's wrongful and retaliatory termination.

92.     On October 6, 2023, Plaintiff filed a complaint with the Iowa Civil Rights Commission and alleged discrimination, harassment, and retaliation based on the protected bases of sex, disability, and age.

93.     Eventually Plaintiff was forced to return to work because she could not afford, financially, to remain on short term disability.

94.     On November 22, 2023, Plaintiff spoke to a human resources representative at the Davenport UPS Center. The representative questioned Plaintiff about her ethicspoint complaint and said there was nothing UPS could really do until "something happened." She also called Plaintiff a "pessimist" when Plaintiff expressed concerns for her safety and asked Plaintiff if Plaintiff was in therapy for her issues.

95.     On November 27, 2023, while Plaintiff was attempting to help a union member with an issue concerning vacation pay, Plaintiff learned that Defendant Allison had told at least one other employee that Plaintiff had been gone awhile and that she "do[es]n't know what she is talking about."

96,     On December 18, 2023, another employee who had been acting very collegially with Defendant Bell told Plaintiff that Plaintiff "wasn't going to lose her job," at least according to management, so Plaintiff can "act normal," now.

97.     On January 8, 2024, Davenport UPS District Manager Tere Huber shadowed Plaintiff and asked Plaintiff many questions about what Plaintiff was doing. Plaintiff was performing her normal job responsibilities as she has performed them for years. Plaintiff was informed by several people that management was watching her area on camera.

98.     On January 12, 2024, and in her capacity as a union steward, Plaintiff witnessed an employee make a complaint of racial discrimination. Defendant Bell was the manager to

13

whom the employee confided about race and/or national origin-based co-worker harassment. Bell proceeded to read the employee UPS' anti-harassment policy, which triggered Plaintiff to become very upset because it reminded Plaintiff of when she complained, and the only response she had received had been to read her policies as if *she* had done something wrong by complaining.

99.     Plaintiff began to cry and was shaking. Plaintiff told Bell that she thought it was ridiculous that when the employee approached Bell for help as to a complaint of discrimination/harassment, Bell's only response was to read that employee the anti-harassment policy.

100.     The employee refused to sign the policy upon Bell's request, and Plaintiff wrote "RTS" for "refused to sign" on the form and wrote a comment to the effect that the reason the employee refused to sign was because *he* was the person being harassed not doing the harassing.

101.     Bell became very angry at Plaintiff and told Plaintiff she could not write that on the form and she told him she could.

102.     Bell and Plaintiff went back and forth on the issue but Plaintiff refused to change what she had written.

103.     On April 25, 2024, Plaintiff had another interaction with Bell where Bell became belligerent toward her while she was preparing the customer counter to open.

104.     Bell first approached her and asked "what are you doing?" in an accusatory way. Plaintiff explained that she was pulling packages off the end of the green belt so that the loaders would have more space on their belt and so that the green belt did not get backed up. By doing this, Plaintiff was preparing this work area for another employee who was going to be arriving soon.

14

E-FILED 2024 MAY 21 12:44 PM SCOTT - CLERK OF DISTRICT COURT

105.   Bell said, "do you know how to do DA [data acquisition]?"

106.   Plaintiff said yes she did know how to do DA.

107.   Bell then said Plaintiff needed to do DA.

108.   Data acquisition, or "DA" involves correcting addresses on packages that need correcting for whatever reason and putting new labels on those packages. This was work that the employee who was soon to be arriving was going to perform with the packages that Plaintiff had been pulling off of the green belt.

109.   Plaintiff explained she had to prepare the customer counter to open and that she was on customer counter time.

110.   Bell said, "I don't see any customers up there." Plaintiff informed Bell she needed to get all the packages sorted and get all the computers up and running and log in to her DIAD board [internal electronic message board], and that she had to look in the back for things that needed processing.

111.   Bell then said, "so you're not going to work as directed?"

112.   By this point, Plaintiff began experiencing a PTSD flare up and began crying.

113.   Plaintiff told Bell she did not appreciate him harassing her and said "yes, I'll work as directed. Direct me what to do."

114.   Bell said "go get your packages for the counter."

115.   Plaintiff did what she was directed and got her packages for the counter.

116.   The employee Plaintiff had been preparing packages for off the green belt arrived and Bell told that employee that Plaintiff was not working as directed and was not helping.

117.   Plaintiff explained to the employee what she had been doing and that she was doing what she does every day, which that employee had appreciated in the past.

15

118.    Bell then looked at Plaintiff and said, "I'm going to be talking to Mike Allison and I'm going to be getting security involved in this."

119.    Plaintiff said, "who, Kate? [the security employee], I'll call her for you."

120.    Plaintiff went to the back of the customer counter and called the security employee and reported what was happening with Bell.

121.    The security employee said Bell should not be threatening Plaintiff with the fact that he would call security, and that she was driving back from Chicago, but when she got on site she would take care of it.

122.    At that point, Plaintiff was very emotional, and told the security employee that she couldn't take it anymore, that every time she comes in she is harassed and targeted and she just wanted to be able to do her job and go home.

123.    The security employee said she would handle the matter when she got in.

124.    Plaintiff had to walk to the DIAD board office to talk to an OMS Clerk (a supervisor) about a package a customer was looking for, Bell said, "this isn't over," and that after Plaintiff punched out she would be talking to him with Mike Allison.

125.    Plaintiff said she did not have to do that because she had the right to have a union steward present and because she had an appointment and Bell said, "yeah, well you'll be talking to me after work."

126.    Plaintiff remained on shift that day but was crying and shaking through much of the workday and her speech was affected by the stress.

127.    Seth Jackson, Plaintiff's son, came to check on her that day and went to supervisors at UPS, and Allison, regarding how affected and stressed Plaintiff was that day but none offered Plaintiff any assistance.

128.   Various employees asked Plaintiff if she was okay and she said she was not, but continued to work.

129.   Bell later ridiculed Plaintiff and others for technical difficulties they had been experiencing with respect to data acquisition.

130.   Plaintiff also followed up after the incident with an ethics complaint.

131.   To date, nothing has been done to help Plaintiff regarding this incident nor any of the circumstances Plaintiff has complained of within the ethics complaints, within her verbal complaints to management, or within her Iowa Civil Rights Commission complaint.

132.   In addition to what has been described above, Plaintiff has experienced an increasingly stressful work environment since the end of 2022 when she was first accused of intentionally destroying Jennings' cell phone, after each of Plaintiff's complaints has been filed, and after she went off work on short term disability.  Aspects of the stressful environment include but are not limited to: interfering with Plaintiff's ability to perform her job duties, reprimanding employees for assisting Plaintiff, interfering with or adding to her shifts, violating seniority by offering other employees shifts, making "errors" with her pay or requested vacation time, demanding that she fulfill certain tasks immediately with no reasonable reason to do so, requesting that she come in for meetings and/or trainings during times that management knows conflict with personal responsibilities Plaintiff has to her family and that she has informed UPS management she has, pitting other employees against Plaintiff and/or spreading rumors/lies about Plaintiff throughout the workplace, and harassing and retaliating against Plaintiff's son, Seth Jackson.

133.   Plaintiff believes that Defendants' wrongful treatment of her, her son, and others will continue if she does not take action.

17

E-FILED 2024 MAY 21 12:44 PM SCOTT - CLERK OF DISTRICT COURT

## CAUSES OF ACTION

### COUNT I – DEFAMATION
### (SLANDER, LIBEL, AND SLANDER AND LIBEL PER SE)
#### (All Defendants)

134. Plaintiff hereby repleads paragraphs 1 through 133 of this Petition as if fully set forth herein.

135. Defendants made disparaging and untruthful statements regarding Plaintiff and her work for UPS including but not limited to statements regarding alleged actions with respect to Jennings or Jennings' cell phone, including that she intentionally or otherwise destroyed the phone by dumping water on it, statements regarding her honesty or trustworthiness, her knowledge of procedure as a UPS employee and/or union steward, and regarding her ability to perform her job as a UPS employee. Defendants made such statements to: employees of UPS, including management/other management and human resources employees, union personnel, and during testimony in the hearing in the small claims matter held in Iowa District Court for Scott County, Iowa on August 31, 2023.

136. These statements include statements made within the scope of UPS' November, 2022 internal investigation into Jennings' cell phone, which Defendant Wood testified, during the course of the small claims incident, had concluded with a finding that Jennings' allegations were "substantiated" meaning, according to Wood, that Jennifer Gott damaged personal property of Julie Jennings.

137. These statements include statements made within the scope of Wood's case file which he testified was located within "the archive."

138. These statements dealt with Plaintiff's competency as a UPS employee.

139. As a direct result of these and other similar statements, Plaintiff has been harmed.

140.    These kinds of harms are those that the law presumes naturally and necessarily result from the communication of libelous and slanderous statements.

141.    Alternatively, these statements were false and caused Plaintiff damages, including but not limited to loss of personal and professional reputation, loss of employment advantages, severe nervous and mental anguish, which continues to the present, and will continue into the foreseeable future, and may be permanent, and additional and miscellaneous damages.

142.    The actions on the part of the Defendants were made with actual malice.

143.    The actions on the part of Defendants were intentional and malicious and made with such disregard to the rights of the Plaintiff, as to constitute malice and entitle the Plaintiff to punitive and exemplary damages.

**COUNT II – TORTIOUS INTERFERENCE WITH PLAINTIFF'S EMPLOYMENT RIGHTS**
**(Defendants Allison, Wood, Bell, McKinney, and Jennings)**

144.    Plaintiff hereby repleads paragraphs 1 through 143 of this Petition as if fully set forth herein.

145.    Plaintiff has been a UPS employee for more than 28 years.

146.    Defendants know of Plaintiff's longstanding employment relationship with UPS.

147.    Defendants have intentionally and improperly interfered in the employment relationship existing between Plaintiff and UPS by making unsupported accusations against her and by attempting to make her employment so stressful that she will quit, and including but not limited to by making and/or perpetuating unsupported complaints against her (e.g. the complaint regarding the cell phone).

148.    Plaintiff has been harmed as a result of Defendants' actions.

E-FILED 2024 MAY 21 12:44 PM SCOTT - CLERK OF DISTRICT COURT

149.    Plaintiff has been harmed as a proximate result of this violation and requests relief as set forth below.

150.    The actions on the part of Defendants were intentional and malicious and made with such disregard to the rights of the Plaintiff, as to constitute malice and entitle the Plaintiff to punitive and exemplary damages.

## COUNT III – CIVIL CONSPIRACY
### (Defendants UPS, Allison, Wood, Bell, McKinney, and Jennings)

151.    Plaintiff hereby repleads paragraphs 1 through 150 of this Petition as if fully set forth herein.

152.    Plaintiff has been a UPS employee for more than 28 years.

153.    Defendants know of Plaintiff's longstanding employment relationship with UPS.

154.    Defendants formed an agreement to intentionally and improperly interfere in the longstanding employment relationship existing between Plaintiff and UPS and to make false statements regarding Plaintiff. Defendants also formed an agreement to together intentionally inflict emotional distress upon Plaintiff. Defendants further formed an agreement to proceed with legal proceedings primarily for an improper purpose (abuse of process).

155.    In other words, Defendants agreed to tortiously interfere with Plaintiff's employment and to commit slander and libel with respect to Plaintiff and Plaintiff in her employment capacity as a UPS employe and/or union steward, and to intentionally inflict upon Plaintiff emotional distress and to abuse process against Plaintiff.

156.    Plaintiff has been harmed as a result of Defendants' actions.

157.    Plaintiff has been harmed as a proximate result of the Defendants' concerted activity and requests relief as set forth below.

158.   The actions on the part of Defendants were intentional and malicious and made with such disregard to the rights of the Plaintiff, as to constitute malice and entitle the Plaintiff to punitive and exemplary damages.

## COUNT IV – ABUSE OF PROCESS
### (Defendants UPS, Allison, Wood, and Jennings)

159.   Plaintiff hereby repleads paragraphs 1 through 158 of this Petition as if fully set forth herein.

160.   On or about May 30, 2023, Defendant Jennings intentionally filed a small claims action against Plaintiff in Scott County, Case No. SCSC240692.

161.   Defendants UPS, including "UPS legal," Allison, Wood, Bell and McKinney supported and encouraged Jennings to file this action, and, upon information and belief, provided her with advice and assistance as to how to proceed in the small claims action against Plaintiff.

162.   Defendants Allison and Wood appeared as witnesses for Jennings at the hearing of the small claims action.

163.   Defendant Wood testified, within the small claims action, that there was evidence to substantiate Jennings' claim that Gott damaged Jennings' phone.

164.   Defendant Wood further testified that UPS legal was aware he was testifying at the small claims matter and had provided permission for him to testify in the small claims action.

165.   Defendant UPS never moved to quash any subpoenas of its employees in the small claims matter which was heard in Scott County, Iowa, including neither the subpoena to Center Manager Allison nor the subpoena to security investigator Wood, who resides in Wisconsin.

166.   Instead, Defendants used this legal process primarily for the purpose of harassing and intimidating Plaintiff and/or attempting to force Plaintiff to quit her longstanding career with

21

UPS, and/or punishing Plaintiff for informing UPS workers of their legal rights, and not for its intended use, which is to seek recovery of damages for a civil wrong.

167.    Defendants' use of the legal process for an improper purpose was a cause of damages to Plaintiff.

168.    The actions on the part of Defendants were intentional and malicious and made with such disregard to the rights of the Plaintiff, as to constitute malice and entitle the Plaintiff to punitive and exemplary damages.

### COUNT V – INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS
### (Defendants UPS, Allison, Bell, McKinney, and Jennings)

169.    Plaintiff incorporates paragraphs 1 through 168 of this Petition as if fully set forth herein.

170.    Defendants' conduct, including but not limited to the following, constitutes the intentional infliction of emotional distress to Plaintiff, and is ongoing:

- Participating in and perpetuating unsupported and/or false complaints against Plaintiff, including via legal proceedings or documents, regarding Jennings or Jennings' cell phone;

- Interfering with Plaintiff's ability to perform her job duties;

- Reprimanding employees for assisting Plaintiff;

- Interfering with or adding to her shifts;

- Widely disclosing and ridiculing Plaintiff's confidential, mental health information and diagnosis;

- Violating seniority by offering other employees shifts;

- Making "errors" with her pay or requested vacation time;

22

E-FILED 2024 MAY 21 12:44 PM SCOTT - CLERK OF DISTRICT COURT

     ⊙    Demanding that she fulfill certain tasks immediately with no reasonable reason to do so;

     ⊙    Requesting that she come in for meetings and/or trainings during times that management knows conflict with personal responsibilities Plaintiff has to her family and that she has informed UPS management she has;

     ⊙    Pitting other employees against Plaintiff and/or spreading rumors/lies about Plaintiff throughout the workplace;

     ⊙    and harassing and retaliating against Plaintiff's son, Seth Jackson.

171.    The Defendants intentionally or recklessly caused emotional distress or acted with reckless disregard of the probability of causing emotional distress to Plaintiff.

172.    The Plaintiff suffered severe or extreme emotional distress as a result of Defendants' actions.

173.    The Defendants' outrageous conduct was a cause and proximate cause of Plaintiff's emotional distress.

174.    The actions on the part of Defendants were intentional and malicious and made with such disregard to the rights of the Plaintiff, as to constitute malice and entitle the Plaintiff to punitive and exemplary damages.

## COUNT VI - SEX DISCRIMINATION AND HARASSMENT IN VIOLATION OF THE IOWA CIVIL RIGHTS ACT, IOWA CODE CHAPTER 216
### (Defendants UPS, Allison, Schaaf, Wood, and Bell)

175.    Plaintiff incorporates paragraphs 1 through 174 of this Petition as if fully set forth herein.

176.    Under the provisions of the Iowa Civil Rights Act, it is unlawful for any person to discriminate against and/or harass an employee on the basis of his or her sex.

177.    Plaintiff is protected under the Act because she is female.

178.    Defendants discriminated against and harassed Plaintiff because of her sex.

179.    Plaintiff suffered an adverse employment action when she was subjected to a hostile work environment.

180.    A casual connection exists between Plaintiff's sex and the adverse employment action.

181.    As a proximate result of Defendants' actions, as outlined above, Plaintiff has in the past and will in the future suffer mental and emotional harm, anguish, humiliation, embarrassment, loss of dignity, lost wages and benefits, and lost earning capacity.

182.    To the extent this claim may be exclusive to other claims within the Petition, Plaintiff pleads it in the alternative.

183.    Plaintiff requestions relief as set forth more fully below.

### COUNT VII - DISABILITY DISCRIMINATION AND HARRASSMENT/HOSTILE WORK ENVIRONMENT IN VIOLATION OF THE IOWA CIVIL RIGHTS ACT, IOWA CODE CHAPTER 216
### (Defendants UPS, Allison, Schaaf, Wood, and Bell)

184.    Plaintiff incorporates paragraphs 1 through 183 of this Petition as if fully set forth herein.

185.    Under the provisions of the Iowa Civil Rights Act, it is unlawful for an employer to discriminate against or harass an employee on the basis of a disability.

186.    After the incident involving Jennings and retaliatory conduct of UPS management, Plaintiff became disabled and was diagnosed with anxiety and PTSD.

187.    Defendant discriminated against Plaintiff with respect to her compensation and terms and conditions of employment by subjecting her to a hostile work environment because of

her disability, record of disability, or perceived disability, all of which are in violation of the
Iowa Civil Rights Act.

188.    Plaintiff suffered adverse employment actions when she was subjected to a hostile
work environment.

189.    A casual connection exists between Plaintiff's disability, record of disability, or
perceived disability and the adverse employment actions.

190.    As a proximate result of Defendant's actions, as outlined above, Plaintiff has in
the past and will in the future suffer mental and emotional harm, anguish, humiliation,
embarrassment, loss of dignity, lost wages and benefits, and lost earning capacity.

191.    To the extent this claim may be exclusive to other claims within the Petition,
Plaintiff pleads it in the alternative.

192.    Plaintiff requests relief as set forth more below.

## COUNT VIII - AGE DISCRIMINATION AND HARASSMENT IN VIOLATION OF THE IOWA CIVIL RIGHTS ACT, IOWA CODE CHAPTER 216
### (Defendants UPS, Allison, Schaaf, Wood, and Bell)

193.    Plaintiff incorporates paragraphs 1 through 192 of this Petition as if fully set forth
herein.

194.    Under the provisions of the Iowa Civil Rights Act, it is unlawful for an employer
to discriminate against and/or harass an employee on the basis of age.

195.    Defendants discriminated against Plaintiff on the basis of her age and with respect
to the terms and conditions of her employment by subjecting her to a hostile work environment.

196.    Plaintiff, in her forties throughout, was protected from discrimination on the basis
of her age.

197.    Plaintiff suffered an adverse employment action when she was subjected to a
hostile work environment.

25

198.    A causal connection exists between Plaintiff's age and the Defendants' discriminatory acts.

199.    As a proximate result of Defendants' actions, as outlined above, Plaintiff has in the past and will in the future suffer mental and emotional harm, anguish, humiliation, embarrassment, loss of dignity, lost wages and benefits, and lost earning capacity.

200.    To the extent this claim may be exclusive to other claims within the Petition, Plaintiff pleads it in the alternative.

201.    Plaintiff requests relief as more fully set forth below.

## COUNT IX - RETALIATION IN VIOLATION OF THE IOWA CIVIL RIGHTS ACT, IOWA CODE CHAPTER 216
### (Defendants UPS, Allison, Schaaf, Wood, and Bell)

202.    Plaintiff incorporates paragraphs 1 through 201 of this Petition as if fully set forth herein.

203.    Under the provisions of the Iowa Civil Rights Act, it is unlawful for an employer to retaliate against an employee because she has engaged in protected activity under the Iowa Civil Rights Act.

204.    Plaintiff engaged in protected activity by filing ethics point complaints and by complaining directly to UPS management, HR, and security.

205.    Plaintiff further engaged in protected activity by filing a complaint, while still employed, with the Iowa Civil Rights Commission.

206.    Plaintiff engaged in protected activity by requesting protected medical leave and/or time off for her anxiety/PTSD.

207.    Plaintiff engaged in protected activity by supporting complaints of others and rejecting UPS' policy of reading the complaining party in a discrimination complaint the anti-harassment policy.

26

E-FILED   2024 MAY 21 12:44 PM SCOTT - CLERK OF DISTRICT COURT

208.    Defendants retaliated against Plaintiff including by subjecting her to a hostile work environment and terminating her son's employment with UPS.

209.    A causal connection exists between Plaintiff's engaging in protected activity, and the Defendants' retaliation.

210.    As a proximate result of Defendants' actions, as outlined above, Plaintiff has in the past and will in the future suffer mental and emotional harm, anguish, humiliation, embarrassment, loss of dignity, lost wages and benefits, and lost earning capacity.

211.    To the extent this claim may be exclusive to other claims within the Petition, Plaintiff pleads it in the alternative.

212.    Plaintiff requests relief as set forth more fully set forth below.

### RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court enter a judgment and seeks the following relief:

A.    An award of back pay and benefits pursuant to Iowa Code Chapter 216;

B.    An adjudication, as applicable, of reasonable front pay and benefits pursuant to Iowa Code Chapter 216;

C.    An award of compensatory damages, including emotional pain, suffering, inconvenience and mental anguish, pursuant to Iowa Code Chapter 216;

D.    An award of pre-judgment interest as provided by law;

E.    An award of offset, as an additional appropriate remedy for any and all income taxes due from her on account of the other damages and/or recovery awards herein;

F.    An adjudication that Plaintiff is entitled to equitable relief in the form of orders and injunctive relief requiring Defendants to do the following:

(i)    Provide training to supervisory employees regarding how to effectively avoid discrimination in employment on the basis of age, disability, and sex, and to report to the court once every six months for a period of three years on the training provided and on its effectiveness;

(ii)    Require that all disciplinary decisions regarding employees employed by Defendant in Iowa be reviewed by an independent EEO agency for compliance with EEO laws and regulations prior to implementation;

(iii)    Monitor the environment in workplaces operated by Defendants in Iowa to assure that employees are not being treated unfairly based on age, disability, or sex and report annually to the court for a period of three years on its monitoring; and

(iv)    Test and evaluate supervisory employees working for Defendants in Iowa to assure that they do not exhibit or act upon bias or bigoted attitudes and opinions against older or female workers, do not tolerate disparate treatment based on age, disability, or sex by their subordinates, and report annually for a period of three years on its testing and evaluating.

G.    An adjudication that Plaintiff is entitled to reasonable attorney fees pursuant to Iowa Code Chapter 216, as well as interest allowed by law and the expenses and/or costs of this action;

H.    An award of lost wages, back pay/front pay, loss of future earning capacity, psychological injury and mental anguish, loss of enjoyment of life, distress, loss of reputation, general damages as presumed and punitive damages, as allowed by law; and

I.    Such other and additional relief as the Court may deem just and proper.

E-FILED 2024 MAY 21 12:44 PM SCOTT - CLERK OF DISTRICT COURT

## JURY DEMAND

Plaintiff hereby demands a jury trial for all claims alleged herein.

Respectfully submitted,

/s/ Megan Flynn

Megan Flynn AT0010000
FLYNN LAW FIRM, P.L.C.
2700 Westown Parkway, Suite 200
West Des Moines, Iowa 50266
Telephone: (515) 809-6975
Facsimile: (855) 296-3165
Email: megan@flynnlawia.com
ATTORNEYS FOR THE PLAINTIFF